# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ARTHUR J. COHN, Derivatively on Behalf Nominal Defendant CHARTER COMMUNICATIONS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:03-CV-177-CAS |
| RONALD L. NELSON, PAUL G. ALLEN, MARC B. NATHANSON, NANCY B. PERETSMAN, WILLIAM D. SAVOY, JOHN H. TORY, CARL E. VOGEL, and LARRY W. WANGBERG, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CHARTER COMMUNICATIONS, INC., | ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This stockholder's derivative action came before the Court on May 23, 2005 for final approval of the settlement and on plaintiff's counsels' application for attorneys' fees and reimbursement of expenses. As discussed below, the proposed settlement will resolve the derivative claims in their entirety in this action and in three shareholder derivative actions filed in the Circuit Court for City of St. Louis ("state court actions").

The proposed settlement ("Settlement") consists of: (1) Charter's adoption of new corporate governance policies that will benefit both the corporation and its shareholders in the years to come; (2) the preservation and advance payment to Charter of funds from Charter's insurers for settlement

of a corresponding Federal securities class action ("Securities Action") and for payment of defense costs in the Securities Action and government investigations and prosecution that otherwise may have been borne by Charter, including negotiation of a settlement with Charter's directors and officers liability insurance carriers of certain policy defenses and claims asserted by them; (3) the achievement of a meaningful modification to the equity portion of the consideration to be paid to the Class in connection with the Securities Action settlement, thereby preserving Company assets; and (4) ensuring that the Securities Action settlement provided the possibility of a financial benefit to the Company in the event that Charter's stock price increases above the valuation that was used for purposes of pricing the equity portion of the settlement consideration for that action. Stated another way, the institution and prosecution of the derivative actions preserved substantial Company assets, including cash.

The value of the Settlement must be considered in the context of the global resolution of <u>all</u> of the securities-related actions that embroiled Charter and its officers and directors. The Settlement attempts to balance the interests of Charter as a going concern while at the same time contributing to the resolution of complex litigation.

More than 75,700 notices have been disseminated to the Charter stockholders. Three objections were received, holding 600 shares in the aggregate.[1]  As discussed herein, these objections do not address the merits of the Settlement.

---

[1]  Objector Robert T. Goldenberg did not submit any documentation or otherwise indicate what his holdings are.

# I. BACKGROUND

## A. General Background

Charter is the third largest broadband communications company in the United States. The Company provides analog video, digital video, cable modem, and telephony services to more than 6.1 million customers residing in 37 different states. Charter, incorporated in Delaware, is headquartered in St. Louis, Missouri.

On July 18, 2002, a Merrill Lynch analyst issued a report that questioned several of Charter's accounting practices, including the capitalization of certain customer service representative costs. The following day, the price of Charter's common stock declined from $4.06 per share to $3.50 per share.

On August 16, 2002, Charter announced that the U.S. Attorney's Office for the Eastern District of Missouri had initiated a grand jury investigation into certain of Charter's operations. The day after this announcement, the price of Charter's common stock declined from $2.71 per share to $2.53 per share.

On April 1, 2003, Charter announced that it was restating its financial reports for 2000 and 2001, and the first three quarters of 2002.

On July 24, 2003, a federal grand jury indicted Charter executives David G. Barford, Kent Kalkwarf, David L. McCall, and James H. Smith, III, for a conspiracy allegedly carried out from May 2001 through March 2002 to inflate Charter's subscriber numbers and subscriber growth numbers. The Indictment charged these individuals with entering into allegedly sham agreements with Scientific-Atlanta, Inc. and Motorola, Inc. in the fall of 2000. All of the indicted individuals eventually entered guilty pleas.

On July 27, 2004, the Securities and Exchange Commission ("SEC") filed a formal Order against Charter, charging the Company with the misconduct set forth in the grand jury indictment. The Order did not allege any wrongdoing regarding Charter's accounting, except with respect to the alleged sham agreements with Motorola and Scientific-Atlanta. Charter consented to entry of an order resolving the SEC's investigation, but did not admit any wrongdoing or pay any fine.

### 1.     Federal and State Court Derivative Litigation

The state court actions, captioned <u>Kenneth Stacey, Derivatively on Behalf of Nominal Defendant Charter Communications, Inc. v. Ronald L. Nelson, et al., and Charter Communications, Inc.</u>, No. 022-10625, <u>Aaron Cane, Derivatively on behalf of Nominal Defendant Charter Communications, Inc., v. Ronald L. Nelson, et al., and Charter Communications, Inc.</u>, No. 022-11450, and <u>Thomas Schimmel v. Paul Allen, et al., and Charter Communications, Inc.</u>, No. 044-00858, were filed in the fall 2002. On December 17, 2002, the Court consolidated the state court actions and appointed Schiffrin & Barroway, LLP, as lead counsel.

Plaintiff Arthur Cohen filed the stockholders' derivative action in this Court, naming as defendants the directors who served on Charter's board of directors ("Board"), namely Ronald L. Nelson, Paul G. Allen, Marc B. Nathanson, Nancy B. Peretsman, William D. Savoy, John H. Tory, Carl E. Vogel and Larry W. Wangberg, for breaches of the directors' fiduciary duties of care and for mismanagement.

Those alleged breaches and mismanagement were premised on the conduct and events discussed above, and included the defendants' alleged failure to maintain controls at Charter with respect to the Company's: (1) overstatement of revenue; (2) failure to appropriately account for cable installation costs; and (3) artificial inflation of the reported number of subscribers for the Company's basic cable services, through, among other things, manipulation of "disconnects"

(voluntary or involuntary disconnects from cable television service). Subscriber numbers and customer disconnects are key metrics examined by investors and securities analysts when they analyze the fiscal health and growth prospects of companies such as Charter. Plaintiffs sought to recover for the Company, inter alia, damages Charter suffered as a result of the defendants' bad faith and reckless failure to monitor, investigate and oversee Charter's business and accounting practices.

Plaintiffs alleged that the defendants were required to so monitor, investigate, and oversee in order to ensure that the financial reports Charter filed with regulatory authorities and disseminated to the public were accurate. The actions and omissions by defendants Nancy B. Peretsman, Ronald L. Nelson and John H. Tory, all of whom served on Company's Audit Committee, were specifically alleged to be violations of those defendants' fiduciary obligations.

### 2. The Securities Action

Fourteen federal securities class action complaints, including StoneRidge Investment Partners LLC v. Charter Communications, Inc., No. 4:02-CV-1186 CAS, were filed against Charter and various other defendants, including Paul G. Allen, Jerald L. Kent, Carl E. Vogel, Kent Kalkwarf, David G. Barford, Paul E. Martin, David L. McCall, Bill Shreffler, Chris Fenger, James H. Smith III, Scientific-Atlanta, Motorola, and Arthur Andersen, LLP. ("Andersen"). These complaints were consolidated, pursuant to order of the Multi-District Litigation Panel, in the U.S. District Court for the Eastern District of Missouri, and captioned In re Charter Communications, Inc. Securities Litigation, MDL Docket No. 1506 (CAS).

### B. Negotiations

In March 2004, plaintiffs in the state court actions and the instant action agreed to coordinate their litigation efforts. Soon thereafter, plaintiffs commenced a dialogue with defendants' counsel regarding a possible resolution. These discussions lasted throughout the summer of 2004. During

the discussions, the parties exchanged certain non-public information with each other. Thereafter, on August 2, 2004, the parties participated in a joint mediation session together with counsel in the securities action. The Honorable Edward A. Infante (Ret.) presided over the joint mediation. At the August 2, 2004 mediation, the parties and Judge Infante discussed, among other things, the respective claims and defenses, expert damages analyses, legal analyses, the discovery and motion practice conducted and expected to be conducted in both the Securities Action and the derivative actions, the evidence expected to be offered by the parties at trial, and other important factual and legal issues and matters relating to the merits of the various claims.

The parties were able to reach an agreement in principle following the August 2, 2004 mediation, which was memorialized in a Memorandum of Understanding ("MOU") dated August 5, 2004. The substance of the MOU is reflected in the Stipulation Of Settlement ("Stipulation") preliminarily approved by this Court on February 15, 2005.

In addition, after the Court's October 12, 2004 decision denying Andersen's motion to dismiss the securities action, negotiations took place that resulted in an agreement to settle all claims and potential claims in the Securities Action as well as the derivative actions against Andersen.

Also on August 5, 2004, the parties to the securities action entered into an MOU to resolve that litigation. The finality of the securities action is conditioned, among other things, upon the final approval of this Settlement, and dismissal of the derivative actions with prejudice.

### C.     Discovery, Investigation, and Research Conducted by Plaintiffs

Plaintiffs conducted a thorough investigation of the facts and legal issues associated with the prosecution and settlement of the derivative actions. This discovery and investigation has included: (1) the retention of a private investigator to assist them, inter alia, in ascertaining the nature of the relationships among the defendants; (2) consultations with various experts, including a corporate

governance expert; (3) a comprehensive review of Charter's public filings, annual reports, and other public statements; (4) researching the applicable law with respect to the claims asserted in the derivative actions and the potential defenses thereto; (5) inspection of tens of thousands pages of documents produced by defendants pursuant to agreement reached during the August 2, 2004 mediation and in the MOU; (6) participating in various interviews with current and former Charter employees, including a current member of Charter's Board.  In short, plaintiffs and their counsel gathered the facts and information necessary to make an informed decision about the merits of the Settlement.

### D.    The Proposed Settlement

Under the terms of the Settlement, defendants have agreed to significantly strengthen the Company's internal controls, processes and procedures through the adoption (in the Company's bylaws, where appropriate) of a new set for corporate governance principles.  In addition to the substantial corporate governance changes, as a result of the Settlement, the Company has received important direct financial benefits which are worth millions of dollars to Charter.  Specifically, plaintiffs:

(1)    helped preserve and advance payment to Charter of funds from Charter's insurers, including, but not limited to, a payment to Charter of $39 million, for settlement of the Securities Action and for payment of defense costs that otherwise may have been borne by Charter. These defense costs included costs in connection with criminal prosecutions and SEC investigations. Plaintiffs also assisted in convincing Charter's insurance providers ("D&O Insurers") to make cash contributions to the Securities Action settlement, including negotiation of a settlement with one of the D&O Insurers of certain policy defenses and claims asserted by it;

(2)     helped reduce the equity portion of the settlement consideration to be provided by the Company pursuant to the terms of the settlement of the Securities Action, thereby protecting the Company from excessive dilution of its public stock float, which would in turn have had a negative effect on Charter's ability to refinance its debt; and

(3)     ensured that the settlement of the Securities Action provided a possibility of a financial benefit to the Company if the price of Charter's stock increases above the valuation that was used in order to price the equity portion of the consideration in the Securities Action settlement.

An important component of the Settlement is the institution of major corporate governance changes at Charter which will implement significant improvements to Charter's internal controls, and provide meaningful ways of avoiding the problems Charter experienced in the recent past. A "term sheet" of these changes was also made available for stockholders' review on the website of the claims administrator for this Settlement, Berdon Claims Administration LLC ("Berdon"). The most significant aspects of these changes are discussed briefly below:

- Charter will adopt a "zero tolerance" policy on holding disconnects for the purpose of deliberately inflating subscriber numbers. As part of the policy, the Company will disconnect non paying customers and shall write off or refer for collection any non-paying customers after 90-120 days. The policy will be monitored by Charter's corporate director of credit and collections. Charter will include disclosures in its Form 10-K and Form 10-Q filings with the SEC as to the number of active subscribers whose accounts are 60 or more days overdue, and will arrange for internal audit review of compliance with disconnect procedures.

- Charter's employee bonus program will be reconfigured so that subscriber growth is not a factor for bonus consideration.

- Charter will reconfigure its budgeting process so that it is a "bottoms-up" process that eliminates industry analysts' projections as a component of establishing Company budget goals.

- Charter will institute a major Corporate Compliance Program. Elements of this program include the institution of a Corporate Compliance Committee to oversee the

program, a secure "whistleblower" program, and a corporate ethics education program.

- Charter will establish a Disclosure Committee to better ensure that Company SEC filings are materially correct and comply with applicable SEC regulations.

- Charter will heighten the standards for Audit Committee membership, increase the number of meetings per year, and increase the scope of the Audit Committee's responsibilities.

All of these reforms must be implemented and maintained for a period of no less than three years following approval of this Settlement. These changes may only be modified by approval of a majority of independent directors who must, within 30 days, propose good faith alternatives to the modified or eliminated reforms.

### E.     Notice of the Proposed Settlement

On February 15, 2005 the Court ordered that Summary Notice of Proposed Settlement of Derivative Actions ("Summary Notice") be published once in The Wall Street Journal and twice as an internet press release. On March 11, 2005, the Summary Notice was published in The Wall Street Journal. The Summary Notice was also published on Business Wire on March 9 and 11, 2005. The Affidavit of Mailing is annexed to the Declaration of Robert I. Harwood in Support of Application for Approval of Settlement and Award of Attorneys' Fees and Reimbursement of Expenses as Exhibit 1.

In addition, in its Preliminary Approval Order the Court also directed that all individual stockholders as of January 24, 2005 receive a copy of the Notice of Pendency and Settlement of Derivative Actions ( "Notice"). The Notice was mailed to current Charter stockholders by Berdon on or about February 25, 2005. In sum, notice was provided to all current Charter shareholders and instructed all current shareholders of their right to object to the proposed settlement, including the request for attorney's fees and litigation expenses totaling up to $2.25 million.

### F. The Settlement in the Context of the Global Settlement

As discussed above, this Settlement and that of the Securities Action constitute a global settlement. The terms of the Securities Action settlement are reflected in separate stipulations of settlement: one with the individual defendants and Company, and a second with Andersen. Class members will receive their pro-rata share of: (1) $64 million in cash; (2) Charter stock with a value of $40 million; and (3) warrants to purchase Charter common stock with an aggregate value of $40 million. Andersen's stipulation of settlement provides that Andersen will contribute more than $2 million into the Securities Action settlement fund.

In order to preserve the Company's assets in connection with the settlement of the Securities Action, plaintiffs in the derivative action were instrumental in assisting to negotiate a structure of the overall resolution of these matters. Under an agreement between the D&O Insurers and the Company (attached to the Stipulation as Exhibit "C") the D&O Insurers will (1) not pay less than $39 million towards the Securities Action settlement fund, and (2) transfer their full $50 million of limits under the relevant insurance policies (net of the Securities Action settlement payment and any prior defense cost payments) to cover defense costs incurred by the Company in connection with these actions. In return, Charter will issue shares of Class A Charter common stock to the D&O Insurers with an aggregate value of $5 million.

The derivative plaintiffs also assisted in arranging for a "collar" in connection with the equity component of the Securities Action settlement consideration. The collar provides both upside and downside protection in order to avoid a windfall to any of the parties to the Securities Action. Under the terms of the Securities Action settlement, the Company will provide a fixed dollar amount rather than a fixed number of shares in connection with this component of the Settlement consideration. If the aggregate value of the shares under the employed valuation is less than $40 million, Charter

must contribute additional shares to create $40 million of value. Thus, Class members are ensured that they will receive stock worth a specified amount. However, if, the valuation formula results in the number of shares having a value above $44 million, Charter is permitted to reduce the number of shares it issues to $44 million plus 50% of the excess of $44 million, with a "cap" of $54 million.[2] This compromise secured a minimum value for Class members while at the same time insuring that neither party received the unfair "benefit" of an unintended windfall as a result of price fluctuations in the stock. It also preserves the Company's assets and avoids dilution of Charter's public stock float.

The Court believes the prosecution of the derivative actions, and plaintiffs' role in the joint mediation process, not only benefitted the Company and helped generate a reasonable and fair recovery in the Securities Action as well. This is significant, since many current Charter stockholders may also be Class members. In light of the parties' firm position regarding the form and amount of consideration it would take to settle the Securities Action, plaintiffs' efforts here to preserve assets, avoid dilution of stock float, and provide upside protection for Charter reflect significant benefits for the Company.

## II.     DISCUSSION

### A.     General Principles

"Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'" In re Xcel Energy, Inc., No. Civ. 02-2677, 2005 WL 840370, at *16 (D. Minn. Apr. 8, 2005) (quoting Maher v. Zapata Corp., 714 F.2d 436,

---

[2]     For example, if the valuation formula resulted in the shares having a value of $48 million, Charter would issue shares with a value of $46 million ($44 million [plus] 50% of $4 million).

455 (5th Cir.1983)). Federal Rule of Civil Procedure 23.1 governs a district court's analysis of the fairness of a settlement of a shareholder derivative action. Weiner v. Roth, 791 F.2d 661 (8th Cir. 1986). Under Rule 23.1, a derivative action "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." In re Gen. Motors Corp. Pick Up Truck Fuel Tank Prod. Liab. Litig., 55 F. 3d 768, 784 (3d Cir. 1995). See also Lidell v. Board of Educ. of City of St. Louis, No. 4:72CV100, 1999 WL 33314210, at *4 (E.D Mo. Mar. 12, 1999) (noting policy in favor of settlement).

In Xcel Energy, the district court relied on the Fifth Circuit's decision Maher v. Zapata, in its discussion of the policy in favor of settlement of shareholder derivative actions. Under Zapata, prior to approving settlement of a derivative action, the court must determine there has been no fraud or collusion in arriving at the settlement agreement, and that it is fair, reasonable and adequate. Zapata, 714 F.2d at 455. The Zapata court further observed that in making its determination of the fairness, reasonableness and adequacy of the settlement, "neither the district court nor the appellate court on review should reach ultimate conclusions on the issues of law or fact underlying the dispute." Id. at 455 n.31 (citation omitted). Similarly, numerous Circuit Courts have cautioned that in reviewing such settlements, "'the temptation to convert [the] settlement hearing into a full trial on the merits must be resisted.'" Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1315 (3d Cir. 1993) (quoting Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co., 834 F.2d 677, 684 (7th Cir. 1987)). This warning is consistent with the general view of federal courts that settlements of shareholder derivative suits are "particularly favored." Xcel; Granada Inv., Inc. v. DWG Corp., 962 F.2d 1203, 1205 (6th Cir. 1992); Zimmerman v. Bell, 800 F.2d 386, 391 (4th Cir. 1986); In re Metropolitan Life Derivative Litig., 935 F. Supp. 286, 294 (S.D.N.Y.1996); Jackson v. Cap. Bank & Trust Co., No Civ. A. 90-4734, 1994 WL 118322, at *3 (E.D. La. Mar. 30, 1994); Cohen v.

Tuttle, Civ. A. No. 85-2396, 1987 WL 7224, at *1 (E.D. Pa. Feb. 24, 1987); Mathes v. Roberts, 85 F.R.D. 710, 713 (S.D.N.Y. 1980); Schimmel v. Goldman, 57 F.R.D. 481, 487 (S.D.N.Y. 1973).

In evaluating a shareholder derivative settlement, the district court is "required to 'independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished.'" In re Cendant Corp. Litig., 232 F. Supp. 2d 327, 332 (D.N.J. 2002) (quoting In re Cendant Corp. Litig. 264 F.3d 201, 231 (3d Cir. 2001)).

Recently, in In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922 (8th Cir. 2005), the Eighth Circuit identified four factors a district court should consider in determining whether a settlement is fair, reasonable, and adequate: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. Id. at 932 (citing Grunin v. Int'l House of Pancakes, 513 F.2d 114, 124 (8th Cir. 1975)). Accord Van Horn v. Trickey, 840 F.2d 604, 606 (8th Cir. 1988). The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." Wireless Tel. 396 F.3d at 932 (quoting Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1150 (8th Cir. 1999)). This Court concludes, as set forth below, the Settlement comports with the factors to be considered.

The Settlement is fair, reasonable, and in the best interests of Charter and its stockholders. In the context of the alleged wrongdoing, the Settlement provides lasting remedial terms that are specifically designed to protect and preserve Charter for the benefit of its shareholders, and preserves valuable assets of the Company. The Settlement's corporate governance reforms are specifically designed to minimize the probability of violations of fiduciary duties and federal

securities laws in the future. As a result of the implementation of the Settlement's corporate governance changes, Charter is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors. Charter's conformance to law, regulations, and the high standards of business ethics required by the prophylactic measures of the Settlement, including: (1) changes to Charter's practices concerning disconnects of customers; (2) modifications to employee bonus programs formerly driven by subscriber growth; and (3) the genesis of a corporate compliance committee and a disclosure committee that are fully expected to help avoid repetition of violations that occurred at the Company and prevent new and different misconduct.

Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies. See Mills v. Electro Auto-Life Co., 396 U.S. 375, 396-97 (1970). See also Friedman v. Baxter Travenol Labs., Inc., No. Civ. A. 8209, 1986 WL 2254, at *5 (Del. Ch. Feb. 18, 1986) (observing that achievement of specific, tangible and long-term corporate governance reforms in stockholder litigation is valuable). Accord In re DPL Inc. Sec. Litig., 307 F. Supp. 2d 947, 952 n.8 (S.D. Ohio 2004). Where the corporate governance reforms are achieved independently of any monetary benefits, the therapeutic benefits are even more worthwhile. Compare In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 252 (D.N. J. 2000), aff'd, 264 F. 2d 201 (3d Cir. 2001) (approving settlement that included corporate governance reforms where "[t]here has not been the slightest suggestion that the cash portion of the settlement was related to deponent on or intertwined with governance proposals").

**B.      Delaware Law**

Because Charter is a Delaware corporation, an analysis of the Settlement under Delaware law is relevant, appropriate and supports the Settlement.  Compare Lewis v. S. L. & E., Inc., 629 F.2d 764, 773 n.21 (2d Cir. 1980).  Federal and Delaware laws are very similar in the factors to be considered when evaluating a settlement.  Delaware courts have long favored the voluntary settlement of complex corporate litigation, such as this one.  See Nottingham Partners v. Dana, 564 A.2d 1089, 1102 (Del. 1989); Polk v. Good, 507 A.2d 531, 535 (Del. 1986); Neponsit Inv. Co. v. Abramson, 405 A.2d 97, 100 (Del. 1979); Rome v. Archer, 197 A.2d 49, 53-54 (Del. 1964).  Settlements are particularly favored in corporate litigation because of the resulting judicial economy.  Prezant v. De Angelis, 636 A.2d 915, 923 (Del. 1994).  Courts further encourage settlements because the litigants are in the best position to evaluate the relative strengths and weaknesses of their case.

This Court's role in considering a proposed settlement is to determine, in the exercise of its own business judgment, whether the settlement is fair and reasonable.  See, e.g., Polk, 507 A.2d at 536; Geller v. Tabas, 462 A.2d 1078, 1082 (Del. 1983); Krinsky v. Helfand, 156 A.2d 90, 94 (Del. 1959).  A full trial on the issues is neither required nor appropriate.  Rather, the Court's duty in reviewing a settlement agreement is to consider the nature of the claims asserted, the possible defenses, and the legal and factual circumstances of the case.  See, e.g., Polk, 507 A.2d at 536; Neponsit, 405 A.2d at 100; Gladstone v. Bennett, 153 A.2d 577, 583 (Del. 1959).

In Kahn v. Sullivan, 594 A.2d 48 (Del. 1991), the Delaware Supreme Court reviewed the standards that guide this Court's discretion in considering the settlement of a class or derivative action.  The Court is to consider the nature of the claims that are asserted, the possible defenses to those claims and the particular legal and factual circumstances of the case.  The Court is then to

15

apply its own business judgment to decide whether the settlement is "reasonable in light of these factors." Id. at 59 (quoting Polk, 507 A.2d at 535). In its evaluation, the Court must avoid trying the issues or deciding the merits of the case. Rather, the Court must consider the nature of the claims, the possible defenses, the legal and factual obstacles plaintiffs would face at trial, and the delay, expense and complexity of litigation. See Kahn, 594 A.2d at 63; Polk, 507 A.2d at 535; Neponsit, 405 A.2d at 100; and Rome, 197 A.2d at 53-54.

Of particular importance is the balance of the strength of the plaintiffs' claims being compromised against the benefits the settlement would secure. See Barkan v. Amsted Indus. Inc., 567 A.2d 1279, 1281 (Del. 1989); Polk, 507 A.2d at 536. The Court believes, that where, as here, the parties have negotiated at arm's-length and in good faith, and plaintiffs have obtained a valuable benefit, the settlement should be approved. See Barkan, 567 A.2d at 1281; Sugarland Indus., Inc. v. Thomas, 420 A.2d 142, 147 (Del. 1980).

### C. The Settlement In Light of the Wireless Telephone Factors

#### 1. The Relief Obtained Balanced By The Likelihood of Success On The Merits

All litigation is fraught with risk. These derivative actions were no different. Based upon their investigation, review of documents and interviews with key witnesses, plaintiffs concluded that they would likely be able to demonstrate that Charter personnel were engaged in a concerted and focused effort to inflate the Company's subscriber count. However, the documents and information also revealed that the most telling evidence of this conduct -- orders from senior personnel to "hold disconnects" until after a fiscal quarter had closed, and otherwise "manage" subscriber disconnects -- principally occurred during a limited time period from May through December of 2001. In addition, there were also issues concerning the quantitative materiality of the "managed

16

disconnects." Further, defendants would likely argue that improperly capitalized customer service representative costs reflected a good faith disagreement in accounting policy, premised on the advise of experts in accounting, and was not the result of deliberate efforts to manipulate Charter's financial statements.

In assessing the Settlement, this Court must balance the benefits accorded to Charter and its stockholders, and the immediacy and certainty of a substantial recovery for them, against the continuing risks of litigation. See City of Detroit v. Grinnell Crop., 495 F.2d 448, 463 (2d Cir. 1974); In re Gulf Oil/Cities Serv. Tender Offer Litig., 142 F.R.D. 588, 591-92 (S.D.N.Y. 1992). Plaintiffs assert they had developed a strong case against the defendants. Nevertheless, because of the inherent uncertainty of litigation, a plaintiff need only establish that, all things considered, "it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." Florida Trailer & Equip. Co. v. Deal, 284 F.2d 567, 573 (5th Cir. 1960).

In assessing the merits of the Settlement, plaintiffs' counsel considered the factual and legal questions that were disputed in the derivative actions. The Court is convinced the proposed Settlement was reached after counsel had conducted an extensive investigation, analyzed the motions to dismiss and supporting documents filed in the Securities Action, while at the same time continuing negotiations with the defendants and Charter. In addition, in order to confirm that the Settlement was fair, reasonable and adequate, counsel reviewed voluminous documents produced by the defendants and conducted an interview of David Merritt, a current Board and Audit Committee member, and also participated in interviews (in cooperation with counsel in the Securities Action) of witnesses (or, in the case of certain witnesses involved in the government's criminal prosecution, their counsel) including senior divisional vice-presidents, internal auditors,

and regional managers. Plaintiffs were cognizant of the defenses that had been asserted (and would continue to be pressed) and ascertained that such defenses had some possibility -- albeit uncertain -- of success.

A substantial amount of work remained to proceed toward trial of this case, including questions regarding plaintiffs' standing to assert the Company's claims, discussed below. In addition, defendants would have also sought to dismiss plaintiffs' claims for breach of fiduciary duty and gross mismanagement. Discovery would have been complex and time-consuming. Experts in corporate governance and damage issues would have to be designated and expert discovery conducted. Defendants' expected motion for summary judgment would have to be opposed and pretrial submissions filed. Thus, the Court believes success in this case was never a certainty.

Although plaintiffs believed that the claims asserted had significant merit, they were equally cognizant of the fact that the derivative actions faced significant hurdles in establishing the defendants' liability and proving damages at trial. These risks included difficulties in proving plaintiffs' claims; in demonstrating plaintiffs' standing under Fed. R. Civ. P. 23.1 and applicable Delaware law; concerning the defendants' alleged breaches of fiduciary duties and the directors' indemnification rights pursuant to 8 Del. Code. Ann. § 102(b)(7); and in establishing causation and damages.

### a.     Plaintiffs' State Law Claims – Standing

Fed. R. Civ. P. 23.1 requires a shareholder seeking to bring a derivative claim to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for plaintiffs' failure to obtain the action or for not making the effort." Plaintiffs would have had to demonstrate demand futility on Charter's Board

in place when plaintiffs filed their Complaint. See generally Blasband v. Rales, 971 F.2d 1034 (3d Cir. 1992).

Plaintiffs faced risks in attempting to establish demand futility on the Board. Plaintiffs argued that demand was excused because a majority of these directors faced personal liability by allegedly breaching their duty of care by failing to properly supervise Charter's operations and financial reporting and by disregarding "red flags" evidencing fraudulent accounting and subscriber calculations. Plaintiffs also alleged that demand was futile because: (1) a majority of the Board was beholden to defendant Paul Allen, Charter's controlling shareholder; and (2) the Board was faced with the risk of having to pay out millions of dollars to settle the federal securities claims against Charter and certain of its officers, and Charter had directors' and officers' liability insurance which Charter itself could likely not access because of the "insured v. insured" exclusion contained in those policies. See, e.g., Kiewit Diversified Group, Inc. v. Federal Ins. Co., 999 F. Supp. 1169, 1179-80 (N.D. Ill. 1998) (recognizing that derivative actions "are not excluded" under "insured v. insured" exclusion).

Where directors are sued derivatively, because they have failed to do something, demand is futile when the complaint contains particularized allegations that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." See White v. Panic, 783 A.2d 543, 551 (Del. 2001); Rales v. Blasband, 634 A.2d 927, 933-34 (Del. 1993). Such a test would apply in a situation, such as here, where a board allegedly failed to supervise employees who engaged in wrongdoing.

While plaintiffs believed that their allegations would be sufficient to overcome demand futility as to the Board, they understood that significant risk existed in connection with defendants'

motions to dismiss. In this regard, Delaware courts have dismissed other cases alleging similar demand futility allegations. See, e.g., Seminaris v. Landa, 662 A.2d 1350 (Del. Ch. 1995) (dismissing action against directors involved in alleged securities claims and restatement of corporate financial statements); In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268 (Del. Ch. 1995) (dismissing action against directors for alleged harm to Baxter where Baxter employees allegedly overcharged the Veterans Administration in connection with sales of medical supplies, culminating in extensive penalties upon both Baxter and its officers in the form of the suspension of VA contract privileges and other serious repercussions).

In addition, although plaintiffs believe that defendant Allen's appointment of a majority of the directors, as well as the fact that certain defendants were employed or maintained business relationships with other Allen-controlled entities supports a finding of demand futility, success was not a certainty either. Defendants would have argued that such allegations were merely conclusory and did not demonstrate that as a result of these relationships, Allen's control over the directors, especially with respect to the allegations of accounting fraud, rendered demand futile. See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040 (Del. 2004) (allegations concerning close personal relationships did not establish demand futility); In re Delta & Pine Land Co. S'holders Litig., No. Civ. A. 17707, 2000 WL 875421 (Del. Ch. June 21, 2000).

Furthermore, missing from this case was unusual insider selling or defendants' otherwise receiving concrete benefits from the artificially-inflated price of Charter's common stock. Thus, the defendants would have argued that they were not "interested" in the wrongdoing alleged here and, therefore, demand should have been made upon the Board.

### b. Plaintiffs' State Law Claims – Breach of Fiduciary Duties

Under Delaware law, a director is required "not only affirmatively to protect the interests of the corporation committed to [an officer's] charge, but also to refrain from doing anything that would work injury to the corporation." Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993) (subsequent history omitted). Defendants would likely have argued that they exercised honest business judgment and adhered to their fiduciary duties to the utmost.

In addition, defendants would argue that all breach of fiduciary duty claims against them for money damages should be dismissed because Charter's certificate of incorporation included an allegedly valid indemnification provision under 8 Del. Code Ann. § 102(b)(7). Section 102(b)(7) permits a corporation to limit or eliminate directors' liability for monetary damages for breach of fiduciary duty via inclusion of an exculpatory provision in a certificate of incorporation. Plaintiffs would have argued that § 102(b)(7) is not applicable because it prohibits indemnification for: (a) breaches of the duty of loyalty; (b) acts and omissions not in good faith or involving intentional misconduct; or (c) transactions in which a director derived an improper personal benefit (all three of which are presumptively applicable). In re Trump Hotels S'holder Deriv. Litig., No. 96 Civ. 7820, 96 Civ. 8527, 2000 WL 1371317, at *18 (S.D.N.Y. Sept. 21, 2000). However, plaintiffs' successful invocation of the § 102(b)(7) exceptions, as well as the underlying claim itself, presented uncertainties and subjective evaluations of defendants' good faith. See Rothenberg v. Santa Fe Pac. Corp., Civ. A. No. 11749, 1992 WL 111206, at *10 (Del. Ch. May 18, 1992) (dismissing breach of duty of care claims based on indemnification provision). But See Kahn v. Roberts, Civ. A. No. 12, 324, 1994 WL 70118, at *7-8 (Del. Ch. Feb. 28, 1994) (section 102(b)(7) does not protect directors from liability resulting from omissions or acts done in bad faith).

Defendants would also likely have maintained that the decisions made by the Board fell under the protections of the "Business Judgment Rule." Under the Business Judgment Rule, plaintiffs would have had the burden of showing that defendants acted without the requisite due care or in bad faith or disloyally, failing to exercise reasonable business judgment. Because it is a very difficult standard--and defendants would have started with the presumption of having acted with proper business judgment-- plaintiffs would have found it difficult to establish a failure to exercise proper business judgment. See In re Resorts Int'l S'holder Litig. Appeals, 570 A.2d 259, 267 (Del. 1990) ("Under Delaware law, the possibility that the actions of the disinterested special committee could be successfully challenged was less than doubtful.").

In addition, allegations that the Board did not have sufficient systems in place to properly monitor Charter's accounting methodologies and subscriber counts are considered to be "possibly the most difficult theory in corporation law on which plaintiff might hope to win a judgment." Saito v. McCall, No. Civ. A. 17132, 2004 WL 3029876, at *6 (Del. Ch. Dec. 20, 2004) (citation omitted). To prove a violation of the "duty to monitor" as elucidated In re Caremark Int'l, Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996), a plaintiff must plead and prove facts that demonstrate "a sustained or systematic failure of the board to exercise oversight -- such an utter failure to attempt to assure a reasonable information and reporting system exists." Id. (citation omitted). Liability is premised "'on a showing that the directors were conscious of the fact that they were not doing their jobs.'" Saito, 2004 WL 3029876, at *6 n.62 (citation omitted). This is a difficult standard to allege, let alone prove on summary judgment or at trial. Although plaintiffs believe that the widespread scope of the accounting and reporting problems should have come to the attention of defendants, and some documentary and oral statements support plaintiffs' Caremark claims, Charter's size and historically decentralized business operations, as well as the presence of an internal audit program

and retention of a large independent auditing firm, renders the outcome of those claims highly uncertain especially given the need to demonstrate "conscious disregard" on the defendants part.

## 2.    Causation and Damages

One of the most disputed issues at trial would likely be who "caused" or was responsible for damages sustained by Charter. Although causation and damages are inextricably linked, each issue involves its own distinct problems. Whether or not defendants' alleged material misrepresentations, omissions and accounting errors "caused" material economic harm to Charter cannot be proven via direct evidence; plaintiffs would have had to rely on both circumstantial evidence and expert testimony. Indeed, the damage assessments of the parties' experts who would be called at trial to testify what the reasonable value of Charter was at the time of the actions alleged in the Complaint were sure to vary substantially. This element would therefore likely be reduced at trial to a battle of experts. One district court observed:

> Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages . . . . In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.

In re Warner Communications Sec. Litig., 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) (citation omitted).

Uncertainties also exist with respect to both the fact and quantum of damages. Courts routinely acknowledge the difficulty in proving damages, particularly in the securities context, where reliance on experts is often necessary. See, e.g., Chatelain v. Prudential-Bache Sec., Inc., 805 F. Supp. 209, 214 (S.D.N.Y. 1992) (noting in the class action context, that the "'complexities of calculating damages increase geometrically.'") (citation omitted). Establishing damages would

require extensive, costly and complex expert testimony. See In re Gulf Oil, 142 F.R.D. at 595 ("[i]n the real world, however, the path to a large damage award is strewn with hazards.").

Accordingly, the Court is convinced that in light of the challenges faced by plaintiffs concerning both their standing and their substantive claims, the uncertainty of defendants' ability to defend successfully against plaintiffs' claims, and the threat to Charter and the individual defendants poised by the Securities Action, the Settlement is an excellent result.

### 3.  Charter's Financial Condition

Even if plaintiffs were deemed to have standing and prevailed on their claims, failure to settle this matter and the related litigation as set forth in the Settlement could have had a negative impact on Charter. For the six months ended June 30, 2004 (Charter's last reported results prior to finalization of settlement negotiations), Charter sustained a significant loss and was facing the prospect of paying off debts in the near future that exceeded available liquid assets. Charter carried $18.5 billion in long-term debt, and the Company conceded that then-current cash flow was insufficient to sustain operations and satisfy upcoming principal repayment obligations for 2005 forward. Moreover, Company management has undergone significant change. Nearly all of Charter's senior officers have resigned.

The Settlement may assist Charter in recovering from these events. The Settlement results in third parties, the D&O Insurers, paying the defense costs that Charter incurred in connection with the related litigation. The D&O Insurers will also direct payments toward the Securities Action cash settlement fund. The Settlement also provides protection against excessive dilution of Charter's stock float, and the corresponding negative impact of dilution on the Company's ability to re-finance debt. In addition, the Settlement provided Charter some protections from fluctuations in its stock price as they relate to the equity component of the Securities Action settlement consideration. While

24

Class members are provided with "downside" protection, thus guaranteeing them a minimum value of equity consideration, Charter is protected from upswings in the stock price, thereby avoiding an unintended windfall to Class members.

The Settlement also obviates risks attendant to pursuit of potential claims against Andersen. Andersen ceased doing business in 2002, and is exposed to billions of dollars in claims from other lawsuits.

### 4. The Complexity, Expense, and Likely Duration of the Litigation

The possible length and complexity of further litigation is also a relevant factor to be considered with respect to the resolution of complex litigation. See Wireless Tel., 396 F.3d at 933. Accord Petrovic, 200 F.3d at 1152. "This factor is designed to capture 'the probable costs, in both time and money, of continued litigation.'" In re Cendant Corp. Litig., 232 F. Supp. 2d at 333 (quoting In re Cendant Corp. Litig. 264 F.3d at 234). Furthermore, where defendant directors are insured, the accumulating litigation costs must be viewed against the existing D&O policy limits, which are likely to "hemorrhag[e] from a significant heating-up and extension of the adversary proceedings." In re Chambers Dev. Sec. Litig., 912 F. Supp. 827, 837 (W.D. Pa. 1995). Here, the first $25 million of the Company's insurance policy, as well as a portion of the second policy, had been used prior to mediation.

This court is convinced that in the absence of the Settlement in this case, it is likely that further litigation would have been complex, expensive, and time consuming. Settlement under such circumstances is clearly favored. See Slade v. Shearson, Hammill & Co., 79 F.R.D. 309, 313-14 (S.D.N.Y. 1978). The claims asserted in derivative actions rest in large part on issues of accounting and guilty pleas of indicted Charter executives, as well as government investigations and prosecutions that have not focused on the defendants in the derivative actions. It is therefore likely

that any judgment in plaintiffs' favor would have been the subject of appeals, further prolonging the litigation, and adding a considerable risk factor. Thus, the Settlement, providing immediate benefits, was advantageous to the Company. <u>Wireless Tel.</u>, 396 F.3d at 933. <u>Accord</u> <u>In re Warner</u>, 618 F. Supp. at 748 ("[a]n appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself."). In short, rather than the risk of trial with no guarantee of collection, the certainty of a settlement limiting the Company's exposure and providing terms designed to avoid a repetition of wrongdoing is preferred. Thus, the Court concludes final approval of the Settlement is warranted.

### 5. Objectors

Over 75,700 notices were mailed to current Charter shareholders. Summary Notice was published in <u>The Wall Street Journal</u>, on <u>Business Wire</u> , and was also made available on Berdon's website. The Notice and Summary Notice described the Settlement and the request for attorney fees and reimbursement of expenses. Two objections to the terms of the Settlement have been filed with the Court. Robert D. Goldenberg filed a pro se objection, simply stating that he objected to the Settlement because "[t]here is no material benefit to the stockholders." As detailed above, the Court believes the Settlement provides significant benefits to Charter shareholders. Pamela A. Couture also filed a pro se objection, stating that she owns 100 shares of Charter common stock and does not "think the settlement is fair to the stockholders." The Court finds the objections are without merit for the reasons set forth above.

### C. ATTORNEYS' FEES

Plaintiff Arthur J. Cohn also moves for an award of attorneys' fees and expenses in the amount of $2.25 million.[3] The Court believes that in light of the substantial benefits achieved in

---

[3] The motion is also submitted on behalf of plaintiffs in three related shareholder derivative actions filed in the Circuit Court for the City of St. Louis (the "State Court Actions"),

this derivative litigation, the time and effort expended by plaintiffs' counsel, the contingent nature of counsel's representation, and the fees awarded in similar lawsuits achieving similar results, the requested fees and expenses are eminently fair and reasonable and should be approved.

Through counsel, plaintiffs conducted an investigation of the facts and legal issues associated with the prosecution and settlement of the derivative actions. The discovery and investigation included, <u>inter alia</u>: (1) the retention of a private investigator to assist in ascertaining the nature of the relationships among the defendants; (2) consultations with various experts, including a corporate governance expert; (3) a comprehensive review of Charter's public filings, annual reports, and other public statements; (4) legal research on the claims asserted in the derivative actions and the potential defenses thereto; (5) inspection of tens of thousands pages of documents produced by defendants pursuant to the agreement reached during the August 2, 2004 mediation and in the MOU; and (6) participation in various interviews with current and former Charter employees and a current member of Charter's Board of Directors. <u>See</u> Declaration of Robert I. Harwood in Support of Application for Approval of Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (the "Harwood Declaration") at ¶¶ 30-31, 37, 81.

Defendants have agreed not to oppose plaintiffs' counsel's request for an aggregate award of fees and expenses up to $2.25 million. Such fees and expenses will be paid from the amount recovered in the related Securities Action. Thus, any award approved by this Court will not be paid by the Company. Lead counsel for the Securities Action class has agreed to this structure as well.

The Court believes the terms of the Settlement reflect a balance of the interests of the Company, its current stockholders, and Securities Action class members, many of whom may also

---

Kenneth Stacey, Aaron Cane, and Thomas Schimmel.

be current Charter stockholders.   As set forth below, the requested fees and expenses are fair, reasonable, and unopposed, and therefore should be approved.

### 1.      Legal Standards

Where, as here, plaintiffs have successfully litigated a shareholder derivative action, plaintiffs' counsel are entitled to an award of attorneys' fees and expenses.  See, e.g., Mills v. Electric Auto-Lite Co., 396 U.S. 375, 396 (1970); Tipton v. Mill Creek Gravel, Inc., 373 F.3d 913, 922-23 (8th Cir. 2004); Ramey v. Cincinnati Enquirer, Inc., 508 F.2d 1188, 1194-95 (6th Cir. 1974). To be entitled to an award of attorneys' fees and expenses, plaintiffs' counsel need not confer a monetary benefit on the corporation,  rather corporate governance reforms and other non-monetary relief are sufficient.  See, e.g., Mills, 396 U.S. at 396 (awarding attorneys' fees in a case resulting in "corporate therapeutics"); Ramey, 508 F.2d at 1194 (same).  As the Sixth Circuit holds,

> The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale. Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a "common fund" for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses.

Ramey, 508 F.2d at 1195 (emphasis added).

In considering awards of attorneys' fees and expenses in class action and derivative litigation, courts focus on four primary factors: (1) the number of hours spent in various legal activities by the individual attorneys; (2) the reasonable hourly rate for the individual attorneys; (3) the contingent nature of success; and (4) the quality of the attorneys' work.  See, e.g., Dekro v. Stern Bros. & Co., 571 F. Supp. 97, 102 (W.D. Mo. 1983) (citations omitted).  In addition, courts may consider the range of fees awarded in similar litigation and the reaction of shareholders to the fee

and expense request.  See, e.g., In re Texas Prison Litig., 191 F.R.D. 164, 177 (W.D. Mo. 1999).

Moreover, where, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference.  See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) (holding that an agreed-to fee is an ideal situation because "[a] request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee."); In re Continental Illinois Sec. Litig., 962 F.2d 566, 568-70 (7th Cir. 1992) (approving agreed-to fees that were negotiated based on market rates); Malchman v. Davis, 761 F.2d 893, 905 n.5 (2d Cir. 1985) ("[W[here, as here, the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems . . . that an agreement 'not to oppose' an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.").

## A.    Number of Hours, Reasonable Hourly Rate, and Mutliplier

A "lodestar" calculation involves multiplying the number of hours expended by a reasonable hourly rate for each attorney's time.  In using a lodestar calculation for determining fees, courts often multiply the lodestar amount by a risk premium factor or "multiplier" based on the risk of recovery and other considerations, to arrive at a reasonable fee.  See, e.g., Blum v. Stenson, 465 U.S. 886 (1984).  The contingency factor is based on elementary considerations of fairness and justice.

Here, plaintiffs' counsel spent more than 1,800 hours investigating, analyzing, and prosecuting the claims in the derivative actions.  See Harwood Declaration at ¶¶ 79-81.  Plaintiffs' counsels' total lodestar is more than $786,000.  Id. at ¶ 79.  Additionally, plaintiffs' counsel have incurred unreimbursed expenses of more than $32,000.00.  Id. at ¶ 82.  Based on those figures, plaintiffs' counsel would receive a multiplier of approximately 2.9.

In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation. See, e.g., Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing 23 settlements and multipliers for each, in which the average multiplier is 3.28); Conley v. Sears, Roebuck & Co., 222 B.R. 181, 1998 U.S. Dist. LEXIS 7503 (D. Mass. May 1, 1998) (multiplier of 8.9 in a derivative action); Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 549 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990) ("Most lodestar multiples awarded in cases like this are between 3 and 4."); Dagron v. Perelman, C.A. No. 15101, 1997 Del. Ch. LEXIS 187 (Aug. 29, 1997) (multiplier of 3.5); In re Metro Mobile CTS, Inc. S'holders Litig., Consol. C.A. No. 12300, 1993 Del. Ch. LEXIS 448 (Aug. 18, 1993) (multiplier of 5.6).

## B. Quality of Counsel's Work

Plaintiffs' counsel are experienced in prosecuting shareholder derivative actions, and successfully negotiated the settlement that saved the parties and the Court significant time, expense, and effort of further litigation. As discussed earlier, the settlement has been valuable in light of the substantial assistance it provided in fostering the settlement of global litigation involving Charter, and preserving assets of Charter. In assessing the time and effort expended by counsel, this Court looks favorably upon the skill of counsel in achieving benefits without burdening the judicial system. See, e.g., Seinfeld v. Coker, 847 A.2d 330, 333 (Del. Ch. 2000) (quoting In re Pullman Co. S'holders Litig., Consol. C.A. No. 10013, Tr. at 11-12 (Del. Ch. Nov. 29, 1988)) ("One of the historic reasons Delaware judges have been so willing to award substantial attorneys' fees, even after a relatively quick settlement of the case, is that our fee awards are not structured to reward lawyers for needlessly prolonging litigation. Put simply, 'the Court does not want to be in a position of encouraging the churning of wheels and devoting unnecessary hours to litigation in order to be able to present larger numbers to the Court.'").

In this case, plaintiffs' counsel conducted an investigation, engaged in discovery, participated in mediation, resulting in a settlement for the benefit of Charter and its shareholders. See Harwood Declaration at ¶¶ 30-37, 81. Hence, through their efforts in the derivative actions, plaintiffs' counsel have conferred benefits on Charter and its shareholders. See, e.g., Zimmerman v. Bell, 800 F.2d 386, 391 (4th Cir. 1986) (quoting Maher v. Zapata Corp., 714 F.2d 436, 466 (5th Cir. 1983)) ("Influencing the future conduct of management may serve the interests of the corporation as fully as a recovery for past misconduct, and a settlement may be accepted 'even though no direct monetary benefits are paid by the defendants to the corporation.'").

Moreover, through their active participation in the mediation and settlement discussions with regard to the Securities Action, plaintiffs' counsel assisted the Company in securing substantial financial benefits, including: (1) payments to Charter from Charter's insurers to fund a portion of the Securities Action settlement and for defense costs that otherwise may have been borne by Charter in connection with the resolution of the Securities Action; and (2) the inclusion of a provision in the settlement of the Securities Action that allows the Company to benefit from increases in the price of Charter stock by, in certain circumstances, reducing the number of shares of Charter stock the Company would be required to issue to satisfy the equity portion of the Securities Action settlement. Thus, plaintiffs' counsel are responsible for achieving financial and equitable relief for Charter and its shareholders that might have been difficult to achieve otherwise.

Courts have often recognized "the significant institutional role of class and derivative actions in the enforcement of the fiduciary duties assumed by corporate officers and directors." In re Anderson Clayton S'holders Litig., C.A. No. 8387, 1988 Del. Ch. LEXIS 127, at *14 (Sept. 19, 1988).

The complexity and societal importance of shareholder derivative and class action litigation calls for the involvement of competent counsel. To encourage competent attorneys to represent plaintiffs on a contingent basis in this type of fiscally and socially important litigation, attorneys' fees awarded should reflect this goal.

## C.      Reaction of Shareholders

This Court may also consider the range of fees awarded in similar litigation and the reaction of shareholders to the fee and expense request. See, e.g., In re Texas Prison Litig., 191 F.R.D. 164, 177 (W.D. Mo. 1999). As to the reaction of shareholders, in this case, the Notice of Settlement was sent to thousands of Charter shareholders, many of them sophisticated institutions. See Affidavit of Mailing attached as Exhibit 1 to the Harwood Declaration. Only two shareholders lodged objections.

Robert T. Goldenberg's objects that "[t]he lawyers will receive the amount of $2,250,000.00, which, judging by the court's records, is excessive for the work that was done and the results obtained." Goldenberg does not identify the "records" to which he refers, nor does he substantiate his belief why the requested fees and expenses are "excessive for the work that was done and the results obtained." In light of the authorities discussed herein, the Court will overrule Goldenberg's objection.

To the extent Kathleen R. O'Connor has made an objection, the Court concludes it is also without merit.[4] O'Connor's objection to the fees and expenses is that: "I especially object to awarding the law firm in the derivative action up to $2.5 million in legal fees because they were 'helpful' in 'achieving' a settlement when those funds should be directed to compensating

_____

[4]      While plaintiffs address the objections of Ms. O'Connor, the Court notes that her objections are not on record with the Clerk's office.

shareholders."  O'Connor's misstates the amount of the fees and expenses sought and ignores the benefits conferred on Charter and its shareholders as a result of plaintiffs' counsel's efforts.  The Court believes O'Connor's statement that the fees and expenses "should be directed to compensating shareholders" may demonstrate her frustration out of not obtaining a greater individual recovery as a purported member of the Class in the Securities Action, which is not relevant to the Court's consideration of an award in the derivative actions.  Accordingly, the Court will overrule Ms. O'Connor's objection.

### C.       Fairness Of The Fee Under Delaware Law

To the extent Delaware law is applicable because Charter is incorporated in Delaware and plaintiffs' causes of action are in part based upon state law, an analysis of Delaware's fee jurisprudence is also relevant.  See Lewis v. S.L. & E., Inc., 629 F.2d 764, 773 n.21 (2d Cir. 1980) (settlement of state law claims requires that settlement be analyzed under state law).   Under Delaware law, in derivative and class actions, plaintiffs' counsel are entitled to an award of attorneys' fees and expenses where counsel's litigation efforts achieve a benefit that inures to a nominal corporate defendant or to all members of the class.  Gottlieb v. Heyden Chem. Corp., 105 A.2d 461, 462 (Del. 1954); Allied Artists Pictures Corp. v. Baron, 413 A.2d 876, 878 (Del. 1980). In this case, the creation of the settlement benefits resulted from the efforts of plaintiffs' counsel in prosecuting the derivative actions and, accordingly, the Court concludes plaintiffs' counsel are entitled to an award of fees and expenses.

### 1.       Applicable Standards under Delaware Law

Delaware courts have enumerated several factors to be considered in determining fee allowances in shareholder actions.  The factors include: (1) the benefits achieved in the action; (2) the efforts of counsel and the time spent in connection with the case; (3) the contingent nature

of the fee; (4) the difficulty of the litigation; and (5) the standing and ability of counsel involved. See, e.g., Sugarland Indus. Inc. v. Thomas, 420 A.2d 142, 149-50 (Del. 1980); Swacker v. Pennroad Corp., 57 A.2d 63, 69 (Del. 1947). The Court believes these criteria support the request for fees and expenses in this case.

### a. Benefits Achieved

In Delaware, the benefit achieved by the litigation is the factor accorded the greatest weight in determining the fee to be awarded. Sugarland, 420 A.2d at 149-50. As detailed above, the successful prosecution of the derivative actions has preserved Company assets and resulted in the implementation of corporate governance enhancements.

Counsel's entitlement to a substantial award is enhanced when the benefit flows directly and proximately from the litigation. In re Anderson Clayton S'holders Litig., Consol. C.A. No. 8387, Mem. op. at 3-4, Allen, C. (Del. Ch. Sept. 19, 1988). Here, the monetary benefits from the Settlement resulted from plaintiffs' efforts.

Delaware courts have placed a significant value upon non-monetary benefits obtained for shareholders. See, e.g., In re AXA Fin. S'holders Litig., Consol. C.A. No. 18268, 2002 Del. Ch. LEXIS 57 (Del. Ch. May 16, 2002) (awarding $3,000,000 in fees where plaintiffs partial cause of increased transaction consideration); Polk v. Good, 507 A.2d 531, 538-39 (Del. 1986) (affirming award of $700,000 in fees, where benefit consisted of modification of voting provision in stock repurchase agreement); Abajian v. Kennedy, C.A. No. 11425, Order & Final Judgment, Allen, C. (Del. Ch. Aug. 19, 1993) (awarding $950,000 in fees and $94,487 for expenses, where benefit consisted of, among other things, mirrored-voting); Gilmartin v. Adobe Res., Corp., C.A. No. 12467, Order, Jacobs, V.C. (Del. Ch. June 29, 1992) ($740,393.81 in fees and expenses awarded for a single

disclosure). In this Action, the Settlement includes several corporate governance measures in addition to the monetary benefit.

The Court believes that the monetary and other benefits conferred on Charter and its stockholders in this case warrants an award of attorneys' fees and expenses in the amount requested.

### b. Contingent Nature of the Fees

Delaware courts also recognize that the contingent nature of the fee must be taken into account in awarding attorneys' fees. See, e.g., Chrysler Corp. v. Dann, 223 A.2d 384, 389 (Del. 1966); Para v. AES Corp., C.A. No. 15376, Transcript at 10, Steele, V.C. (Del. Ch. Sept. 10, 1998). Plaintiffs' counsel worked many hours towards the prosecution of this case, as well as towards the fairness of the Settlement and negotiation and documentation of the Settlement's terms, without an assurance of receiving any fees or expenses. See Harwood Declaration at ¶¶ 83-84.

### c. Efforts of Counsel

In analyzing the time and effort expended by counsel, Delaware courts look favorably upon the efforts of counsel in achieving a substantial recovery without burdening the judicial system. See In re Metro Mobile CTS, Inc. S'holders Litig., Consol. C.A. No. 12300, Order & Final Judgment, Berger, V.C. (Del. Ch. Aug. 18, 1993). The Court believes plaintiffs' counsel should be rewarded in light of the benefit they created and their ability to resolve the litigation in an efficient manner, thereby conserving judicial resources. The Court also notes the amount of the fee was negotiated at arm's-length between plaintiffs' counsel, defendants' counsel, and Securities Action class counsel. Under such circumstances, Delaware courts have expressed reluctance to "second-guess" the settling defendants' agreement to pay the fee, with the result that, while the Court must be satisfied as to its fairness and reasonableness, the Court's scrutiny can be less intensive. See In re Intek Global Corp., C.A. No. 17207, Tr. at 36-37, Strine, V.C. (Del. Ch. Apr. 24, 2000); In re

PIMCO Advisors Holdings, L.P. S'holders Litig., Consol. C.A. No. 17511, Transcript at 68-69, Lamb, V.C. (Del. Ch. May 3, 2000).

### d. Standing and Ability of Counsel

Another factor this Court may consider in an application for attorney's fees is the standing and ability of counsel. As discussed above, the attorneys who prosecuted the derivative action are experienced in shareholder class and derivative litigation.

### e. Public Policy Considerations

The Supreme Court has emphasized that while private actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action,'" it is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation, and the benefits that would not otherwise be achieved. See Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985) (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964)).

This Court believes that because of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorney's fees awarded should reflect this goal. In this case, the court concludes plaintiffs' counsel's request for fees and expenses of $2.25 million is reasonable. Accordingly, the request for fees and expenses will be approved

### III. CONCLUSION

For all of the foregoing reasons, the Court will grant the motions for final approval of the settlement and for attorneys' fees and expenses in the amount of $2.25 million.

Accordingly,

36

**IT IS HEREBY ORDERED** that plaintiff's counsel's motion for final approval of the settlement is **GRANTED.** (Doc. 81.)

**IT IS FURTHER ORDERED** that plaintiff's counsel's motion for attorneys' fees is **GRANTED**. (Doc. 82.)


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this 30th day of June, 2005.